1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ERIC WHEELER, | CASE NO. 1:12-cv-00860-LJO-MJS (PC) |
| Plaintiff, | **FINDINGS AND RECOMMENDATIONS TO GRANT IN PART AND DENY IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| K. ALICESON, et al., | **(ECF No. 74)** |
| Defendants. | **FOURTEEN (14) DAY OBJECTION DEADLINE** |

## I.    Procedural History

Plaintiff is a state prisoner proceeding pro se and in forma pauperis in this civil rights action brought pursuant to 28 U.S.C. § 1983. (ECF Nos. 1 & 5.) The action proceeds against Defendants Garcia, Goss, Trevino, Isira, and Coffin on Plaintiff's First Amendment retaliation claim, and against Defendant Isira on Plaintiff's Eighth Amendment medical indifference and state law negligence claims.

Before the Court is Defendants' April 20, 2015 motion for summary judgment. (ECF No. 74.) Plaintiff filed an opposition (ECF No. 81), and Defendants filed a reply (ECF No. 83).

Thereafter, the Court granted the parties' request to extend the discovery cut-off

1   and granted Plaintiff leave to file a supplemental opposition after receiving additional

2   discovery. (ECF No. 84.) Plaintiff filed his supplemental opposition on September 4,

3   2015. (ECF No. 100.) Defendants filed a reply (ECF No. 101) and objections to some of

4   Plaintiff's evidence (ECF No. 102). Plaintiff responded to Defendants' objections. (ECF

5   No. 103.)

6        These matters are submitted. Local Rule 230(*l*).

7   **II.   Plaintiff's Claims**

8        This action proceeds on Plaintiff's second amended complaint against Defendants

9   Raymond Coffin, Chief of Mental Health; Clinician Rocio Garcia, M.S.W.; Lillian Goss,

10   L.P.T.; Clinician Victor Trevino, M.S.W.; and Abdul Isira, Psy.D. Plaintiff complains of

11   acts that occurred at California Substance Abuse Treatment Facility ("CSATF") in

12   Corcoran, California.

13        Plaintiff alleges that Defendants Garcia, Goss, and Trevino retaliated against him

14   for filing a staff complaint against non-party Correctional Officers and for writing a

15   complaint letter to the Warden. According to Plaintiff, these Defendants wrote fabricated

16   reports, CDC-128 chronos, and CDCR-115 Rules Violation Reports ("RVRs") designed

17   to force Plaintiff's transfer out of G-1 Facility. As a result, Plaintiff eventually was

18   transferred to an overcrowded gym where his mental health condition could not be

19   effectively treated or accommodated. There, Plaintiff came under the care of Defendant

20   Isira. Isira, in concert with the other Defendants, retaliated against Plaintiff by

21   intentionally falsifying medical records, misdiagnosing Plaintiff, providing unacceptable

22   mental health care, and terminating Plaintiff's Enhanced Outpatient Program ("EOP")

23   level of care. Defendant Coffin was aware of this retaliation but failed to act to prevent it.

24        The Court screened Plaintiff's second amended complaint and concluded that

25   Plaintiff successfully pleaded a cognizable retaliation claim against Defendants Garcia,

26   Goss, Trevino, and Isira based on allegations that they were aware of his staff

27   complaints and grievances and, shortly after becoming aware, made false reports

28   designed to remove him from the EOP unit and the EOP level of care. (ECF Nos. 26 and

28.) The Court also found that Plaintiff pleaded a cognizable retaliation claim against Defendant Coffin based on the allegation that Coffin was aware of retaliatory conduct by his subordinates and failed to respond and prevent further retaliation, notwithstanding having the opportunity to do so.

The Court additionally concluded that Plaintiff pleaded cognizable medical indifference and state law negligence claims against Defendant Isira based on the allegations that Isira intentionally misdiagnosed Plaintiff so as to cause Plaintiff's EOP level care and treatment to be terminated.

## III.    Undisputed Facts

Plaintiff's opposition and supplemental opposition total over one hundred pages plus approximately five hundred additional pages of exhibits. Therein, Plaintiff discusses multiple issues not pertinent to this litigation. As previously stated, Plaintiff's second amended complaint was found to state cognizable retaliation claims against Defendants Garcia, Goss, Trevino, Isira, and Coffin, and medical indifference and medical negligence claims against Defendant Isira. Plaintiff has not stated a cognizable medical indifference claim against Defendants Garcia, Goss, Trevino or Coffin, and facts relating to such potential claims will not be considered or addressed here. Likewise, assertions that these Defendants did not maintain a therapeutic relationship with Plaintiff or keep his confidences are not at issue here. Plaintiff's claims that these Defendants were not properly licensed are similarly irrelevant. Finally, Plaintiff goes on at some length about how Defendants disliked him, held his underlying criminal offenses against him, and did not believe his claims of innocence. He expresses concern that his once close relationship with Defendant Garcia deteriorated and Defendant Garcia began to prefer the company of other inmates. None of these allegations address matters of constitutional import or relate to whether Plaintiff was retaliated against for engaging in protected conduct.  They will not be discussed further.

With the foregoing in mind, and unless otherwise stated, the Court finds the following facts to be undisputed.[1]

### A.    Transfer to CSATF

Plaintiff arrived at CSATF on June 7, 2010 and was placed in the Enhanced Outpatient Program ("EOP")[2] in the G-1 Facility. According to Plaintiff, he enjoyed a positive relationship with mental health staff – and particularly with Defendant Garcia – during this time, even though, he alleges, much of his mental health care was inadequate. However, on January 19, 2011, Plaintiff was involved in an altercation with another inmate. The incident resulted in correctional officers using force against Plaintiff and Plaintiff's placement in Administrative Segregation and/or medical housing. Plaintiff filed a staff complaint against the involved correctional officers.[3] Plaintiff was released back to Facility G-1 on March 24, 2011.

### B.    Return to Facility G-1

Following his return to Facility G-1, Plaintiff had numerous uneventful encounters with Defendants Trevino, Garcia, and Goss throughout April and May of 2011. Trevino saw Plaintiff for mental health visits and noted that Plaintiff expressed hostility toward custody staff. (ECF No. 74-2 at 59-77.) Plaintiff participated in group sessions with Garcia and had other interactions with Goss in April and May of 2011 without incident. (E.g., ECF No. 81-1 at 9-10, 16-17.) According to Plaintiff, on May 25, 2011, he received the second level response to his appeal regarding the January 19, 2011 incident. Garcia

---

[1] Plaintiff did not provide a separate statement of undisputed facts. He states that he disputes all facts contained within Defendants' statement of undisputed facts. The Court has reviewed the submissions of the parties and, based thereon, has concluded that the facts presented herein are undisputed unless otherwise stated.

[2] "The EOP level of care is for inmates who suffer 'Acute Onset or Significant Decompensation of a serious mental disorder characterized by increased delusional thinking, hallucinatory experiences, marked changes in affect, and vegetative signs with definitive impairment of reality testing and/or judgment,' and who are unable to function in the general prison population but do not require twenty-four hour nursing care or inpatient hospitalization." Coleman v. Schwarzenegger, 922 F.Supp.2d 882, 903 n.24 (E.D. Cal. 2009).

[3] He also filed a lawsuit which is ongoing. See Wheeler v. Alison, No. 1:12-cv-00861-DAD-DLB (PC-G) (E.D. Cal.).

1  was present when he received the response and laughed. Plaintiff states that Garcia's

2  mood toward Plaintiff changed after this date.

3      In early June 2011, Plaintiff began to have difficulties with mental health staff and

4  particularly with Defendant Garcia. According to Plaintiff, he confronted Garcia in early

5  June regarding what he perceived as her misconduct. Specifically, Plaintiff believed

6  Garcia was misusing state computers and was overfamiliar with certain "pet" inmates.

7  Plaintiff contends that he warned Garcia that she needed to be careful or she would be

8  caught. According to Plaintiff, Garcia reacted to this information with anger and abruptly

9  terminated the conversation. Plaintiff claims that, subsequently, during a June 4, 2011

10  group session, Garcia lashed out at Plaintiff when he attempted to present a

11  philosophical paper he had written.

12      Defendant Trevino saw Plaintiff on June 7, 2011 and noted that Plaintiff was

13  angry and agitated and had complaints regarding mental health staff. According to

14  Trevino, Plaintiff stated, "I feel that staff should be able to talk to me like a friend . . . like

15  a human being." Trevino advised Plaintiff that "he needs to mind staff boundaries." (ECF

16  No. 74-2 at 78.) Plaintiff contends that these notes misrepresent his statements. He

17  states that he attempted to discuss his difficulties with Garcia during the session, but

18  Trevino was not interested in Plaintiff's side of the story.

19      Defendant Garcia claims to have written the following 128 chrono regarding her

20  encounters with Plaintiff in early June. The chrono itself is not in the record; however an

21  email from Garcia to Defendant Isira on June 30, 2011 purported to relay the contents of

22  the chrono as follows:

23           On 06/08/2011 at approximately 7:35 am while performing
             my duties as a clinical social worker, I walked into my office in
24           G1-Cluster A and saw an envelope addressed to "Ms.
             Garcia" on the floor. I opened it and it was a letter of apology
25           from inmate Wheeler . . . for being argumentative me [sic]
             while in Distress Tolerance Group on 06/03/11. I approached
26           inmate Wheeler in the dayroom and gave him back the letter
             and asked him to refrain from putting notes under my office
27           door. He was not receptive to my verbal counsel by placing a

28

1
2
3
4

> second envelope with a note under my door on 06/10/11. I gave the second letter back to inmate Wheeler and informed him that I was going to notify custody of what he was doing. Inmate stated, "you don't have to tell custody." I walked away from the inmate in the dayroom and immediately informed Correctional Officer Phillips.

5   (ECF No. 74-2 at 44-45.)

6   Plaintiff disputes that any such chrono was written. He denies that the events
7   described therein occurred.

8   On June 14, 2011, Plaintiff wrote a letter to Warden K. Allison, complaining about
9   what he viewed as misconduct by staff in Facility G-1.[4] (ECF No. 74-2 at 17-18.) Plaintiff
10  stated that he was writing the letter confidentially due to fears of retaliation by staff. He
11  complained that a non-party mental health staff person was using the internet for
12  personal use during work time, not holding group, and paying undue attention to female
13  staff. Plaintiff claimed that this conduct left his mental health needs unsatisfied. He also
14  stated that "some" clinicians were violating various laws by telling custody officers about
15  private inmate communications. As an example, he stated that inmate Dunsford told
16  non-party clinician Kerr that inmate Bonilla made threats against Dunsford. Kerr told
17  Defendant Garcia, Garcia told Bonilla, and Bonilla told everyone in the building. Plaintiff
18  also complained that custody staff had access to the room in which mental health files
19  were stored, and that some custody staff and clinicians had too close of a relationship,
20  thus diminishing the trust inmates had in mental health staff. Aside from the mention of
21  Garcia noted above, no other Defendants were mentioned by name in this letter.

22  Defendant Coffin eventually responded to Plaintiff's June 14, 2011 letter to the
23  Warden. (ECF No. 81-1 at 104.) Coffin acknowledged that Plaintiff's letter concerned
24  violations of Departmental standards and professional ethics, and also acknowledged
25  Plaintiff's concern that he risked retaliation. Coffin advised Plaintiff that retaliation would

26

27
_____

28  [4] Plaintiff claims to have verbally complained about this perceived misconduct, as well as other misconduct, to numerous individuals during the relevant period.

6

1    not be tolerated, and that Plaintiff's allegations should be submitted through the

2    administrative appeal process.

3        On June 16, 2011, another incident occurred between Plaintiff and Defendant

4    Garcia. It is undisputed that Plaintiff told Garcia that he liked her shoes and stated that

5    he made this comment to see her reaction. Garcia informed Plaintiff that the comment

6    could be seen as an attempt at overfamiliarity. Plaintiff disputes that he was attempting

7    to be overfamiliar. Defendant Garcia authored a CDC-128B Informational chrono

8    regarding this encounter. The chrono is the primary basis for Plaintiff's claim against

9    Garcia. It reads as follows[5]:

> On Thursday, June 16, 2011, at approximately 1100 hours
> while performing my duties as a clinical social worker, I
> walked through the dayroom in 'G1' cluster 'A' and Inmate
> WHEELER . . . stated, "Nice shoes you are wearing today
> Garcia." His manner was sarcastic and he had a grin on his
> face when he made the comment. He further added, "I only
> made that comment to see your reaction." Inmate was
> informed that such statements can be seen as him attempting
> to be over familiar. He was not receptive to my counseling by
> being argumentative and at this time I ended the
> conversation and walked away. Inmate was verbally
> counseled on this matter and it was documented on his bed
> card. . . .

18    (ECF No. 81-1 at 91.)

19        Plaintiff disputes that he was being argumentative and states that he was not

20    informed that his discussion with Garcia constituted verbal counseling or that the matter

21    was documented on his bed card.

22        Garcia also authored an Interdisciplinary Progress Note regarding this incident.

23    The note stated:

> I/P was seen for a Verbal Counsel. I/P was informed that his
> comments made to me regarding my wardrobe were
> inappropriate. I/P had previously stated, "I only made that

---

[5] Many of Plaintiff's allegations relate to written reports or other communications authored by Defendants. The Court finds that Plaintiff's arguments often mischaracterize and exaggerate these reports. Thus, the Court finds it necessary to repeat most of these communications verbatim.

> comment to see your reaction." I/P was explained that statements like that can be seen as him attempting to be overfamiliar. I/P stated, "You used to talk to me more before and you also flirted with me." I stated, "Mr. Wheeler I have never interacted with you in an unprofessional manner. I treat you and every other inmate with respect and I expect respect from you guys." I/P became apologetic and stated "I didn't mean that. . . but you did talk to me more before." I/P was asked not to address clinician unless it is a mental health crisis and his clinician is not available.

Additionally, Garcia stated:

> I/P appeared somewhat hypomanic. He started to speak in a rapid rate and became irritable as the session continued. I/P was asked to respect my boundaries and refrain from interacting with me unless it is concerning his mental health. I consulted with I/Ps primary clinician, colleagues, and clinical supervisor. I/P will be taken to IDTT next week to discuss his inappropriate interactions with me and other staff. Custody staff was also made aware of this incident and clinician write in on I/Ps bed card that he was Verbally Counseled.

(ECF No. 74-2 at 42.)

On June 21, 2011, Plaintiff met with Trevino for a routine clinical session. Trevino noted, in relevant part, as follows:

> I/P states "I talked to Dr. Musgrove and I understand that I've been making mistakes by my actions so I'm going to stop talking to all staff." I/P was referring to situation where I/P continues to try to monopolize the time of every mental health staff that passes by him in dayroom including clinicians and LPTs. . . . I/P also continues to display behavior that suggests he is trying to "run" the cluster and that he is watching out over peers and "protecting" staff from other inmates. . . . I/P asserts that he is a "convict" and not an "inmate" like other individuals on the cluster . . . I/P suggests that he is above his peers and that he should be treated by such a manner by mental health staff and custody.

(ECF No. 74-2 at 80.)

Trevino noted that Plaintiff was not receptive to education regarding the impact of his behavior on others and that "concerns that have been arising with [Plaintiff's] inappropriate behavior related to staff as well as with his peers" would be discussed at

an upcoming Inter-Disciplinary Treatment Team ("IDTT") meeting. (Id.) Plaintiff contends that Trevino took his statements out of context. He maintains that he has a right to protect staff if he so chooses.

On June 22, 2011, Plaintiff had contact with several staff members regarding his behavior toward mental health staff. Non-party Correctional Sergeant J. Tangen attended an interview of Plaintiff by non-party Lieutenant Rivero regarding Plaintiff's "unusual behavior" towards Garcia and authored a CDC-128B General chrono regarding the interview:

> Inmate Wheeler stated that he told social worker Garcia that he likes her shoes, to see how she would respond in order to "feel her out." Inmate Wheeler also stated that he tried to give social worker Garcia a note but she refused to take it. Inmate Wheeler was questioned about the contents of the note but refused to disclose it, stating that he threw it away. Inmate Wheelers [sic] behavior has also been witnessed by Facility G, E.O.P. Correctional Officer L. Lozano. Inmate Wheeler was verbally counseled on his conduct and warned that any future violations would result in progressive discipline. . . .

(ECF No. 81-1 at 93.)

Plaintiff disputes that he tried to give Garcia a note, stating that he had only tried to give her a paper relating to a "DBT class." Plaintiff contends that Garcia had made it appear to Rivero that these events had occurred on the morning of June 22, when in fact they had occurred one week prior. Plaintiff claims that, after this interview, Rivero told Plaintiff to return to the Facility and to keep his mouth shut as the Warden and her staff were present. According to Plaintiff, Rivero stated that Garcia had told the Warden that she was not uncomfortable with or afraid of Plaintiff. Plaintiff contends that, when he returned to Facility G, he spoke with the Warden and her staff regarding his staff complaints.[6]

---

[6] As will be discussed below, this contention is disputed and is somewhat contradicted by Plaintiff's deposition testimony.

Defendant Goss claims that she had an encounter with Plaintiff on June 22, 2011. Plaintiff disputes that he spoke with Goss on June 22, 2011. Nevertheless, Defendant Goss issued Plaintiff a 115 Rules Violation Report ("RVR") for "Behavior that Could Lead to Violence" in relation to the incident.[7] The RVR alleged as follows:

> On Wednesday, June 22, 2011, at approximately 0645 hours, I was sweeping my office in 'G1' cluster 'A' when Inmate WHEELER . . . knocked on my door and showed me a dust pan and dust broom. I opened the door and he was talking about helping another inmate who had been pacing the day hall, then his conversation switched to how he felt like he was my guardian angel. Inmate WHEELER likes to talk a lot and I was trying to shut the door Inmate WHEELER took a step towards me, invading my personal space, closing to within 18 inches from me, saying with a smirk on his face, "Look around your cluster, do you see an officer anywhere?" I felt threatened and a sustained fear for my safety and quickly closed the office door, not coming out of the office until Inmate WHEELER had gone to breakfast. At approximately 1330 hours on the same day I stepped out of my office in 'G1' cluster 'A' and Inmate WHEELER stopped me again. (This probably made about the sixth (6th) time he had stopped me today. Every time I walked in or out of the office he would start talking to me about something. Inmate WHEELER sits with his chair between the office and the exit.) He said that he wanted to show me something in a dictionary and Thesaurus that he was holding. He stated, I want to show you this because of a certain female clinician that is trying to make trouble for me because I am unable to talk to women."
>
> He immediately started opening the dictionary and showed me the word 'flirt' and was reading the definition of 'flirt.' As he held the book in front of my face I could see were [sic] he had underlined the whole definition of 'flirt.' As I started to walk away he said, 'Wait a minute, look at this.' and flipped the Thesaurus open to another word. I'm not sure the word he was reading but noticed all the definition was underlined. Again I started walking towards the exit of cluster 'A' and he said, "Mrs. Goss." I turned and with a raised voice so loud that everyone in the day hall in cluster 'A' could easily hear him he stated, 'This conversation is to be kept between you and me." I turned and walked out of the cluster to inform Correctional Officer Lozano of what happened. Per her instructions I went to cluster 'C' to inform Inmate WHEELER's

---

[7] The RVR was not signed until June 24, 2011.

1
2

clinician Trevino. I then waited in cluster 'C' in order to avoid
going back through the day room and having Inmate
WHEELER approach me yet again.

3

(ECF No. 81-1 at 80-81.)

4

Goss also authored substantially similar Interdisciplinary Progress Notes (ECF

5

No. 81-1 at 99-100) and General chronos (ECF No. 81-2 at 122) regarding this incident.

6

Trevino also saw Plaintiff on June 22, 2011 for a "confidential clinical contact."

7

(ECF No. 74-2 at 82.) Trevino noted the following:

8
9
10
11
12
13
14
15
16
17
18
19
20

I/P stated "a certain female clinician is out to get me because
she is mad that I have not been saying hello and good
morning to her like she told me to." I/P was agitated and
referenced an earlier meeting with the Lieutenant and
another staff related to predatory and intrusive behavior that
I/P has been displaying around female staff. I/P has
continued to suggest that he is unlike any inmate in here and
that he needs to be treated differently. P/C reminded I/P that
he is an inmate patient and that he must respect every staff
members boundaries. I/P became agitated verbalizing that he
had done nothing wrong but that "a certain staff is having
some problems right now" and that if he gives her some time,
she will get "over it." I/P is having difficulty understanding that
his recent interactions with female staff has been
inappropriate and he has been pushing boundaries. I/P has
also been continued to display "convict" mentality as per his
words meaning that he has verbalizes that he feels the need
to protect female staff from "these inmates." I/P has been
educated by staff as well as by custody that his role is not to
protect, rather it is so be patient participating in treatment. I/P
displays little insight into his behaviors and it is possible that
he is purposefully attempting to manipulate staff.

21

(ECF No. 74-2 at 82.)

22

According to Plaintiff, Trevino asked Plaintiff about his encounters with Rivero and

23

the Warden that morning and was unhappy to hear that Plaintiff spoke with the Warden

24

about his staff complaints. Trevino told Plaintiff that he should not bother the Warden

25

because she is very busy, and Plaintiff responded that he would speak with whoever he

26

chose.

27
28

1

**C.   Transfer to Facility E and the Care of Defendant Isira**

2      On June 23, 2011, non-party Correctional Sergeant J. Johnson authored two

3  CDC-128B General chronos regarding moving Plaintiff out of Facility G-1 and into

4  Facility E. In one chrono, Johnson stated that "[t]his move is being done because

5  Wheeler is stalking medical staff and lower functioning inmates. . . ." (ECF No. 81-1 at

6  95.) In the other, Johnson stated that "[t]he A.O.D., AW M. Tan, authorized Wheeler to

7  be moved to Facility 'E' Gym. This move is being done because Wheeler has been

8  threatening mental health staff (see RVR-G-11-06-014 authored by LPT L. Goss)." (ECF

9  No. 81-1 at 95.)

10      According to Plaintiff, his mental health needs could not be fully accommodated

11 on Facility E.

12      At some point thereafter, Plaintiff apparently was moved to Administrative

13 Segregation ("Ad-Seg") on Facility E. On June 27, 2011, Defendant Trevino sent an

14 email to Defendants Garcia and Goss and other non-parties stating:

15        I spoke with Lieutenant Rivero briefly this morning and he
16        notified me that I/P Wheeler … is no longer in E1 AdSeg and
          is currently being housed in E Yard. He said that as a result
17        of the 128's he will do what he can to make sure that he does
          not return to G1. I will contact Echo yard clinicians to fill them
18        in on the situation.

19 (ECF No. 81-1 at 128.)

20      That same day, Trevino reached out to Defendant Isira (a clinician on Facility E)

21 by email stating, "I have some information to share with you if [Plaintiff] is on your

22 caseload." (ECF No. 81-1 at 130.) Isira responded that Plaintiff had not yet been seen.

23 (Id.) Trevino responded with the following information:

24        I/P Wheeler has been displaying predatory behavior and has
25        made attempts to become over-familiar with female staff in
          G1 and has also been making attempts to split staff and
26        monopolize staff time at every opportunity (see C file for
          chonro [sic]). I/P reports numerous mental health symptoms
27        yet appears to be mostly concerned with his status as a
          "convict" and how he can "protect" staff from other inmates.
28

12

> I/P Wheeler's characterological traits significantly interfere with his treatment and insight into his behavior. I wanted to take this opportunity to communicate with you and E yard clinicians be aware of this information in working with him and determining his level of care needs. . . .

(ECF No. 81-1 at 133.)

Isira first saw Plaintiff on June 29, 2011. (ECF No. 74-2 at 96, 104.) Plaintiff claims that Isira was rude, made racially disparaging remarks, and disbelieved Plaintiff's claims regarding his mental health. Isira noted that Plaintiff's speech was hurried and laced with profanity and that Plaintiff was insistent in his demands. Isira later informed Trevino by email that he had seen Wheeler, who "ramble[d] on" "about his experiences in G yard and elsewhere." Isira further stated:

> He exhibited very little insight into his issues and problems, or the willingness to work on introspective growth, though he insists he wants and needs help. I also noted he has poor conversational skills in terms of his capacity to have a "two-way" conversation where both parties exchange thoughts and ideas. This trait I can surmise, greatly hindered his group participation immensely in the EOP program, couples with a marked proclivity of his to validate himself through challenging staff or casting aspersions regarding their competency. This behavior seems to stem from a marked sense of his own inferiority and an insecure sense of self. I don't see where these tendencies will relent or improve and this impression has raised serious concerns about his suitability for EOP program participation in a correctional setting.

(ECF No. 81-1 at 132-33.)

Isira requested further information from Trevino regarding Wheeler's "predatory" behavior. Trevino responded:

> In regard to I/P Wheelers behavior, per his report he shared that in the past he has had an inappropriate relationship with a female C/O which resulted in her losing her job. I/P Wheeler was also pushing boundaries with LPT's as well as with other female staff in the building. Some of his behavior can be described as "grooming" staff as well as making inferences that a female staff was "flirting" with him. I/P Wheeler also appeared to be attempting to "run" the cluster,

> in getting back to his "convict" mentality. Staff were also concerned that he may have been bullying or threatening peers to act appropriately, as is customary on the "main line" or in his attempt to "protect" staff.
>
> . . . LPT Goss and Ms. Garcia both reported feeling uncomfortable around I/P Wheeler and generated 128's in essence stating that they felt unsafe with him in the building, I generated a 128 as well in regards to this situation.

(ECF No. 81-1 at 132.)

Isira thanked Trevino for his response and stated:

> . . . this wealth of information you provided will serve as additional fodder from which I can formulate a decision about his ongoing appropriateness for participation in mental health services at the EOP level of care. I intend to schedule an IDTT in short order to have our E-yard treatment team review and decide on an appropriate course of action…. I think it is particularly important that I/P's are appropriately evaluated for both suitability to participate in their designated treatment programs and their capacity to maintain acceptable boundaries with staff. Our team members should be respected and feel safe while performing their assigned duties, in my opinion. It would be imprudent, should he be found unsuitable by the IDTT team, to allow I/P Wheeler to engage in a similar pattern of behaviors in another EOP program setting. I am particularly concerned with your revelations about his inappropriate behavior toward our female team members and his efforts to have other EOP program participants "behave properly" insofar as "mainline" I/P behavior patterns.

(ECF No. 81-1 at 135.)

Isira next saw Plaintiff on July 8, 2011. (ECF No. 74-2 at 97, 106.) Plaintiff contends that Isira was rude, yelled at Plaintiff, and stated that he would make sure Plaintiff would not return to Facility G. Isira noted that Plaintiff was agitated and did not address the clinical questions asked of him.

On July 13, 2011, Plaintiff attended a classification committee meeting. (ECF No. 81-1 at 142.) Although Plaintiff claims that the committee told him that he would be cleared to return to Facility G following the hearing on the RVR issued by Goss, the committee's report reflects only that Plaintiff was released to Facility E.

14

Isira saw Plaintiff again on July 15, 2011. According to Plaintiff, Isira was belligerent, racist, and discussed Defendants Garcia and Goss, According to Isira, Plaintiff was upset about pending proceedings on the RVR issued by Goss. (ECF No. 74-2 at 97, 108.)

A hearing on the RVR issued by Goss was conducted on July 20, 2011. The Hearings Officer found Plaintiff not guilty and dismissed the charge. The decision was based on three findings: (1) no verbal threats were made, (2) no aggressive physical actions were reported, and (3) there was no threat to staff or alarm activation. (ECF No. 81-1 at 88.) The Hearings Officer did not, as Plaintiff contends, find that the allegations were unsubstantiated or untrue. The hearings officer elected to document the allegations as a CDC-128B chrono "for future reference." (Id.)

Isira next saw Plaintiff on July 22, 2011. According to Plaintiff, Isira was racist and yelling and "demanded to know everything about Garcia." Plaintiff ended the session and told Isira to "kiss [his] white ass." According to Isira, Plaintiff was belligerent, hostile, and inappropriate. He became threatening and the encounter was terminated prematurely due to Isira's safety concerns. Isira documented the event in a 128B chrono and an Interdisciplinary Progress Note. (ECF No. 74-2 at 97-98, 110, 112.) The 128B states in relevant part as follows:

> [Wheeler] became belligerent and launched into a profanity laced tirade that resulted in the session being terminated prematurely and he being told to leave the treatment space. During his tirade, I/P Wheeler stated that female staff on G-yard had "lied and set me up." I/P Wheeler had arrived on E-Yard at CSATF/SP late in the month of June after being dismissed from Enhanced Outpatient Program (EOP) on G-Yard as a program failure. G-Yard staff reported that I/P Wheeler had engaged in a systematic pattern of intimidation of staff in general, and overstepping personal boundaries with female staff, in particular. Several female clinicians reported that they were fearful of I/P Wheeler and concerned about his volatility when they interacted with him during required clinical activities. While evaluating I/P Wheeler for continuing EOP program availability by discussing this behavior with him on July 22nd, I/P Wheeler stated, "I was guarding the female

1
2
3
4
5

> staff from other inmates." When reminded that custody, and not him as an inmate, is responsible for the safety of all staff, I/P Wheeler launched into the profanity laced tirade described above. The outburst in anger I witnessed was consistent with the pattern of hostility that had been reported by G-Yard treatment team members who deemed him a program failure and unsuitable to participate in the insight oriented EOP program's varied therapeutic activities.

6    (ECF No. 74-2 at 110.)

7    **D.    Removal from EOP Level of Care**

8    On July 26, 2011, the IDTT team elected to reduce Plaintiff's level of care from

9    EOP to CCCMS.[8] Isira participated in the IDTT discussions as the IDTT leader. He also

10   prepared a Mental Health Treatment Plan for Plaintiff. Therein, Isira noted that Plaintiff

11   was "obsessed with female staff and his supposed 'relationships' with them." (ECF No.

12   74-2 at 115.) Significantly, he listed Plaintiff's diagnoses as sexual sadism, pedophilia,

13   post-traumatic stress disorder (rule/out), and narcissistic personality disorder. (Id. at

14   116.) This was a change from Plaintiff's prior diagnoses of post-traumatic stress disorder

15   and major depressive disorder, single episode, severe without psychotic feature. (Id. at

16   100; ECF No. 81-1 at 1.) Isira states that he based his diagnoses on Plaintiff's medical

17   records, central file, and Isira's own observations of Plaintiff. Isira states that his

18   diagnoses of sexual sadism and pedophilia were drawn from his review of Plaintiff's

19   court transcripts, which described in detail numerous episodes of such behavior.

20   According to Isira, he was without the data or means to verify the diagnosis of post-

21   traumatic stress disorder, and thus maintained this possible diagnosis in Plaintiff's

22   treatment plan. However, Plaintiff refused to discuss his background relating to an

23   instance of major depressive disorder and Isira found no documentation upon which

24   such a diagnosis would rest; accordingly, this diagnosis was omitted. (ECF No. 74-2 at

25

26
27
28

---

[8] CCCMS stands for Correctional Clinical Case Management Services, which is the lowest of the four levels of care within the prison system's Mental Health Services Delivery Program. Coleman v. Schwarzenegger, 922 F.Supp.2d 882, 903 (E.D. Cal. 2009). "The CCCMS level of care is for inmates whose symptoms are under control or in partial remission and can function in the general prison population, administrative segregation, or segregated housing units." Id. at 903 n.24.

116.) In any event, Isira states that his clinical impressions were not based on information received from Defendants regarding Plaintiff's behavior on Facility G.

On August 1, 2011, Isira shared with Trevino information relating to Wheeler's reduction to CCCMS status, stating:

> This development should preclude the possibility of his return to the G-yard EOP program or his being placed in another EOP setting at another CDCR institution. The revelations shared by you and Ms. Garcia of I/P Wheeler's behavior on G-yard were particularly valuable in making this determination. I would like to commend both of you and the remaining members of the treatment team, for your willingness to swiftly relay and share such critical information. This was a great example of the type of collaboration and teamwork that needs to occur here at CSATF/SP more often.

(ECF No. 81-1 at 137.)

**E.     Return to EOP Level of Care[9]**

At some point, Plaintiff was placed in Ad-Seg on Facility E. (See ECF No. 81-2 at 16.) On September 27, 2011, Plaintiff underwent an IDTT meeting with non-parties. A Mental Health Treatment Plan was prepared by non-party Dr. Butler. (ECF No. 81-2 at 15.) Therein, Dr. Butler reinstated Plaintiff's diagnoses of major depressive disorder and antisocial traits. However, Dr. Butler and the IDTT maintained Plaintiff's CCCMS status and did not refer him for a higher level of care. (ECF No. 81-2 at 18.)

On November 4, 2011, Isira authored a 128B Information chrono regarding safety concerns involving threats allegedly made against Isira by Plaintiff. Therein, Isira noted that Plaintiff was upset about Isira's diagnoses and decision to remove Plaintiff from the EOP level of care. (ECF No. 74-2 at 122.)

On November 15, 2011, Defendant Garcia co-authored a 128C chrono regarding Plaintiff. The chrono recounted information contained in the chronos described above,

---

[9] Plaintiff is proceeding in this action on his second amended complaint, which involves the conduct described above. He moved to amend his complaint to add claims relating to conduct that occurred after his removal from the EOP program. (ECF No. 87.) Leave to amend was denied. (ECF No. 114.) Accordingly, although Defendants' subsequent conduct is not at issue in this action, it is described briefly herein to provide a fuller understanding of the operative claims.

1    and stated that Plaintiff had recently sent Garcia correspondence asking that Garcia

2    remove certain notes and chronos from Plaintiff's file. Garcia stated that she was

3    concerned with Plaintiff's focus on her, felt harassed, and would not feel safe if Plaintiff

4    returned to Facility G-1. (ECF No. 74-2 at 47.) Plaintiff acknowledges that he sent Garcia

5    two CDCR-22 Forms requesting that she remove chronos from his file.

6         On May 21, 2012, non-party Dr. Vickers evaluated Plaintiff in relation to an

7    administrative appeal. (See ECF No. 81-2 at 42-44.) Vickers noted that "although there

8    may be factors of clinical relevance regarding IP's controlling offense, and pervasive

9    characterological traits, recent evaluation . . . indicates . . . that the current focus of

10   clinical attention . . . is related to primary diagnoses of Major Depressive Disorder and

11   Post Traumatic Stress Disorder." (ECF No. 81-2 at 42.)

12        On November 6, 2012, Plaintiff participated in an IDTT meeting, under the

13   supervision of Dr. Vickers, for the purpose of changing his level of care from CCCMS

14   back to EOP. (ECF No. 81-2 at 56.) Based on this change, Plaintiff apparently was

15   considered for transfer back to Facility G.

16        **F.    Transfers between CSATF and Mule Creek State Prison**

17        On November 14, 2012, non-party Correctional Counsel I K. Rocha interviewed

18   Defendant Garcia regarding Plaintiff's potential transfer back to Facility G. (ECF No. 81-2

19   at 112.)  According to the chrono authored by Rocha, "Garcia stated that she does not

20   wish any further contact with Inmate Wheeler and would not feel safe if he returned to

21   Facility G II SNY." (ECF No. 81-2 at 112.)

22        On November 28, 2012, Plaintiff appeared before a Unit Classification Committee

23   on Facility E for program review. (ECF No. 100 at 95.) The committee noted that Plaintiff

24   required transfer to a Level II SNY EOP facility. However, Facility G at CSATF is the only

25   such facility. The committee noted the November 14, 2012 discussion between Rocha

26   and Garcia concerning Plaintiff's potential placement there, as well as other chronos

27   involving Defendant Garcia, and, as a result, did not recommend Plaintiff be returned to

28   Facility G.  Instead, Plaintiff was recommended for transfer to Mule Creek State Prison's

1  Level III SNY EOP facility as the only institution that could accommodate Plaintiff's
2  mental health concerns due to the preclusion from Facility G.

3  Plaintiff was not immediately transferred and, on February 13, 2013, Plaintiff
4  appeared before a classification committee for an annual review and for consideration of
5  transfer due to Plaintiff's return to EOP level of care. The committee again noted that
6  Plaintiff required transfer to a Level II SNY EOP facility but that his placement on Facility
7  G was not recommended. Instead, Plaintiff again was recommended for transfer to the
8  Mule Creek State Prison's Level III SNY EOP. (ECF No. 81-2 at 110). Plaintiff disagreed
9  with the decision and stated his desire to return to Facility G. (ECF No. 81-2 at 111.)

10  Plaintiff was transferred to Mule Creek State Prison on March 29, 2013.

11  In October 2013, Garcia and Goss exchanged emails disparaging Plaintiff.
12  Therein, Garcia stated that Plaintiff was "still stalking" Garcia, had "contacted the
13  litigation department" at her new institution, and had her "name, middle name and
14  everything." ECF No. 81-2 at 116.)

15  At some point, Plaintiff was transferred to California Medical Facility and
16  eventually, on April 29, 2014, he was returned to Facility G-1 at CSATF. [10]

17  At the time of Plaintiff's return, Garcia was no longer working at CSATF. Goss
18  remained at CSATF and Facility G. On April 30, 2014, Goss authored a General chrono
19  stating:

20
21  Officer McNary came into my cluster to inform me that I/P
   Wheeler . . . was here in Cluster A in Cell 4. I proceeded to
   tell him all of the above [referring to her past chronos], when
22  Officer McNary left the office, I could not step out of my office
   to hold group, Ms. Netzley R.T. noticed how upset I was and
23  offered to hold my 1100 group. I felt threatened by this I/P
   presence. My heart is pounding in my chest, I feel a bit shaky
24  thinking about his past stalking behaviors directed toward me,
   I fear for my safety, and would prefer that he be sent to
25  another facility.

26

27  _____
   [10] Documents before the Court reflect that Plaintiff objected to his return to CSATF due to fears that he
   would face retaliation there by Defendants and others. (ECF No. 93-1 at 94-96.) In administrative appeals,
28  Plaintiff stated that he instead should have been returned to Mule Creek State Prison.

1 (ECF No. 81-2 at 122.)

2 On May 1, 2014 Garcia and Goss again exchanged emails regarding Plaintiff and

3 discussed their chronos and Plaintiff's "crazy" allegations against them. (ECF No. 81-2 at

4 126.)

5 Documents associated with an administrative appeal filed by Plaintiff indicate that

6 Goss was interviewed by a Counselor Zometa on May 1, 2014. (ECF No. 81-2 at 129.)

7 Goss expressed concerns regarding Plaintiff's return to SATF. "She stated she

8 previously issued the appellant a Serious Rules Violation Report documenting his

9 behavior; however it had been reduced to a Counseling Chrono." (Id.) Counselor Zometa

10 did not find documentation of the RVR in Plaintiff's file, but did locate a CDC-128B

11 describing the events and referring to the RVR. Zometa also spoke with Garcia, who

12 also expressed safety concerns regarding Plaintiff.

13 At some point later in 2014, Plaintiff was returned to Mule Creek State Prison,

14 where he remains housed.

15 **IV.    Defendants' Objections to Plaintiff's Submissions**

16 **A.    Supplemental Opposition**

17 Defendants object that Plaintiff's supplemental opposition violates the Court order

18 permitting such opposition. (ECF No. 101.) On June 3, 2015, the Court extended the

19 discovery cut-off at the request of the parties and, as a result, granted Plaintiff "an

20 opportunity to file a supplemental opposition to the motion for summary judgment, if any

21 he has, following receipt of additional discovery." (ECF No. 84 at 41-42.) The Court

22 limited the supplemental opposition to twenty-five pages, excluding exhibits. (Id.)

23 On September 4, 2015, Plaintiff filed a supplemental opposition totaling 36 pages,

24 with an additional 78 pages of exhibits. (ECF No. 100.) The opposition functions largely

25 as a surreply and does not focus exclusively on matters that were the subject of

26 additional discovery. Plaintiff concedes that his supplemental opposition is longer than

27 ordered and is in essence a surreply, but argues that such a response was necessary.

28 (ECF No. 103 at 2.)

1    Although the Court did not authorize or desire a surreply, it also did not limit

2  substance of what Plaintiff was allowed to present in his supplemental opposition. In light

3  of Plaintiff's pro se status and the lack of specificity in the Court's order, the Court will

4  consider the contents of Plaintiff's supplemental opposition.

5    The Court did, however, specifically limit the supplemental opposition to twenty-

6  five pages. Plaintiff did not request permission to exceed the page limit. He exceeded

7  that limit at his own peril. The Court is satisfied that the 116 pages of Plaintiff's briefing

8  that are under consideration are sufficient for Plaintiff to adequately present his case,

9  particularly in light of the hundreds of additional pages of exhibits submitted for review.

10  The Court will not consider material presented in Plaintiff's supplemental opposition after

11  the twenty-fifth page.

12    The Court did not limit the number of exhibits that Plaintiff was permitted to submit

13  with his supplemental opposition. Those exhibits have been considered to the extent

14  they are material.

15    **B.    Deposition Testimony**

16    Defendants object to portions of Plaintiff's deposition testimony and sworn

17  opposition, on the ground such testimony contains inadmissible hearsay. (ECF No. 102.)

18  The testimony concerns a conversation allegedly held between Plaintiff and non-party

19  Lieutenant Rivero on June 22, 2011, in which Rivero reportedly stated (1) that the

20  Warden was at that moment in Facility G discussing Plaintiff's complaint letter with staff,

21  (2) that Garcia had stated she was neither uncomfortable with nor afraid of Plaintiff; (3)

22  that Plaintiff was acting normally and that Defendants' conduct against him was unusual,

23  and (4) that he could not understand why Garcia wanted to "get rid of" Plaintiff. (See

24  ECF No. 100 at 12.)

25    Only admissible evidence may be considered in ruling on a motion for summary

26  judgment. Orr v. Bank of America, 285 F.3d 764, 773 (9th Cir. 2002); see also Fed. R.

27  Civ. P. 56(e). In determining admissibility for summary judgment purposes, it is the

28  contents of the evidence rather than its form that must be considered. Fraser v. Goodale,

1    342 F.3d 1032, 1036-37 (9th Cir. 2003). If the contents of the evidence could be

2    presented in an admissible form at trial, those contents may be considered on summary

3    judgment even if the evidence itself is hearsay. Id. (affirming consideration of hearsay

4    contents of plaintiff's diary on summary judgment because at trial, plaintiff's testimony of

5    contents would not be hearsay). However, the Court may not consider inadmissible

6    hearsay evidence which could not be presented in an admissible form at trial. See

7    Medina v. Multaler, Inc., 547 F. Supp. 2d 1099, 1122 (C.D. Cal. 2007) ("Medina bases

8    much of her declaration on hearsay evidence that will not be admissible at trial. Medina

9    will not, for example, be able to take the witness stand at trial and recount statements

10   that constitute hearsay, double hearsay, or triple hearsay.").

11          As presented, Plaintiff's testimony concerning his conversation with Lieutenant

12   Rivero contains multiple layers of hearsay: Plaintiff testified regarding what he was told

13   by Rivero regarding statements made by Garcia and the Warden. These statements are

14   offered for the truth of the matter asserted. Plaintiff has made no showing that the facts

15   underlying the declaration could be presented in an admissible form at trial, and thus,

16   that his testimony should be considered for purposes of summary judgment. Cf. Fonseca

17   v. Sysco Food Servs. of Arizona, Inc., 374 F.3d 840, 846 (9th Cir. 2004) (concluding that

18   hearsay evidence could be presented in admissible form at trial); Fraser v. Goodale, 342

19   F.3d 1032, 1037 (9th Cir. 2003) (same). His testimony therefore is inadequate under

20   Federal Rule of Civil Procedure 56(e). See Block v. City of Los Angeles, 253 F.3d 410,

21   418-19 (9th Cir. 2001) (holding that an affidavit which contained hearsay statements that

22   were not based on personal knowledge and failed to set forth facts that would be

23   admissible in evidence did not meet the requirements of Rule 56(e)).

24          Defendants' objections to this testimony will be sustained.

25          **C.    Trevino Declaration**

26          Defendants object to the declaration of Inmate Martin Trevino. (ECF No. 100.)

27   The declaration was submitted with Plaintiff's opposition to Defendants' motion, and

28

1    concerns Inmate Trevino's observations of Plaintiff and Defendants Garcia and Goss

2    during the time period at issue. (ECF No. 81-2 at 149-50.)

3        This objection is untimely. The declaration was submitted on May 21, 2015 with

4    Plaintiff's opposition. Defendants did not object to the declaration at the time of

5    submitting their reply. (ECF No. 83.) Instead, they waited until September 15, 2015 to

6    submit these objections, purporting to object to portions of Plaintiff's September 4, 2015

7    supplemental opposition. (ECF No. 100.)

8        The objection is overruled without prejudice. Regardless, the Court finds the

9    declaration does not contain evidence material to the disposition of the motion for

10   summary judgment. Accordingly, it is not discussed further herein.

11   **V.    Discussion**

12       **A.    Legal Standard on Summary Judgment**

13       Any party may move for summary judgment, and the Court shall grant summary

14   judgment if the movant shows that there is no genuine dispute as to any material fact

15   and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Wash.

16   Mut. Inc. v. United States, 636 F.3d 1207, 1216 (9th Cir. 2011). Each party's position,

17   whether it be that a fact is disputed or undisputed, must be supported by (1) citing to

18   particular parts of materials in the record, including but not limited to depositions,

19   documents, declarations, or discovery; or (2) showing that the materials cited do not

20   establish the presence or absence of a genuine dispute or that the opposing party

21   cannot produce admissible evidence to support the fact. Fed R. Civ. P. 56(c)(1).

22       Plaintiff bears the burden of proof at trial, and to prevail on summary judgment, he

23   must affirmatively demonstrate that no reasonable trier of fact could find other than for

24   him. Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007). Defendants

25   do not bear the burden of proof at trial and, in moving for summary judgment, they need

26   only prove an absence of evidence to support Plaintiff's case. In re Oracle Corp. Secs.

27   Litig., 627 F.3d 376, 387 (9th Cir. 2010).

28

1    In judging the evidence at the summary judgment stage, the Court may not make

2    credibility determinations or weigh conflicting evidence, Soremekun, 509 F.3d at 984,

3    and it must draw all inferences in the light most favorable to the nonmoving party,

4    Comite de Jornaleros de Redondo Beach v. City of Redondo Beach, 657 F.3d 936, 942

5    (9th Cir. 2011).

6    **B.    First Amendment Retaliation**

7         **1.    Legal Standard**

8         "Within the prison context, a viable claim of First Amendment retaliation entails

9    five basic elements: (1) An assertion that a state actor took some adverse action against

10   an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4)

11   chilled the inmate's exercise of his First Amendment rights, and (5) the action did not

12   reasonably advance a legitimate correctional goal." Rhodes v. Robinson, 408 F.3d 559,

13   567-68 (9th Cir. 2005).

14        The second element of a prisoner retaliation claim focuses on causation and

15   motive. See Brodheim v. Cry, 584 F.3d 1262, 1271 (9th Cir. 2009). A plaintiff must show

16   that his protected conduct was a "'substantial' or 'motivating' factor behind the

17   defendant's conduct." Id. (quoting Sorrano's Gasco. Inc. v. Morgan, 874 F.2d 1310, 1314

18   (9th Cir. 1989). Although it can be difficult to establish the motive or intent of the

19   defendant, a plaintiff may rely on circumstantial evidence. Bruce v. Ylst, 351 F.3d 1283,

20   1288-89 (9th Cir. 2003) (finding that a prisoner establishes a triable issue of fact

21   regarding prison officials' retaliatory motives by raising issues of suspect timing,

22   evidence, and statements); Hines v. Gomez, 108 F.3d 265, 267-68 (9th Cir. 1997); Pratt

23   v. Rowland, 65 F.3d 802, 808 (9th Cir. 1995) ("timing can properly be considered as

24   circumstantial evidence of retaliatory intent").

25        The third prong can be satisfied by various activities. Filing a grievance is a

26   protected action under the First Amendment. Valandingham v. Bojorquez, 866 F.2d

27   1135, 1138 (9th Cir. 1989). Pursuing a civil rights litigation similarly is protected under

28   the First Amendment. Rizzo v. Dawson, 778 F.2d 527, 532 (9th Cir. 1985).

1    With respect to the fourth prong, "[it] would be unjust to allow a defendant to

2  escape liability for a First Amendment violation merely because an unusually determined

3  plaintiff persists in his protected activity . . . ." Mendocino Envtl. Ctr. v. Mendocino Cnty.,

4  192 F.3d 1283, 1300 (9th Cir. 1999). The correct inquiry is to determine whether an

5  official's acts would chill or silence a person of ordinary firmness from future First

6  Amendment activities. Rhodes, 408 F.3d at 568-69 (citing Mendocino Envtl. Ctr., 192

7  F.3d at 1300).

8    With respect to the fifth prong, a prisoner must affirmatively show that "the prison

9  authorities' retaliatory action did not advance legitimate goals of the correctional

10  institution or was not tailored narrowly enough to achieve such goals." Rizzo, 778 F.2d at

11  532.

12              **2.    Inaccurate Records**

13    As noted, Plaintiff's opposition points are lengthy and often address matters of

14  little or no legal relevance to the claims at issue. In particular with regard to the

15  retaliation claim, Plaintiff alleges that various records written by Defendants are

16  inaccurate and that several chronos should have been removed from his file after he was

17  found not-guilty on the RVR written by Goss.

18    Plaintiff apparently believes he has a stand-alone right to accurate prison

19  records.  He does not.  See Hernandez v. Johnston, 833 F.2d 1316, 1319 (9th Cir.

20  1987). In any event, no such claim is properly before the Court at this time; it was

21  dismissed at the screening stage. (ECF Nos. 26, 28.) Unless alleged inaccuracies rise to

22  the level of retaliation, they cannot support Plaintiff's claim in this action.

23    Plaintiff's contention that chronos should have been removed from his file appears

24  to be based upon an erroneous interpretation of Title 15, section 3326(a)(2) of the

25  California Code of Regulations. Regardless, no claims based upon the California Code

26  of Regulations are presently before the Court.

27

28

### 3.     Defendant Coffin

Plaintiff has presented no evidence to show that Defendant Coffin retaliated against him for the exercise of his First Amendment rights or that Coffin knew of such retaliation by his subordinates and failed to act.

Plaintiff wrote to the Warden on June 14, 2011, complaining of Facility G staffs' improper use of computers and disclosure of confidential records. Coffin responded. Although Plaintiff's letter expressed his fear of retaliation, it did not complain of or even describe any ongoing retaliation or identify any perpetrators of retaliation. Nothing in the letter put Coffin on notice of alleged retaliation.  Nothing suggests Coffin turned a blind eye to such retaliation. Moreover, Defendant Coffin avers that he was not aware of Plaintiff's letter until June 27, 2011, a date after the alleged retaliation occurred. Plaintiff speculates to the contrary, but speculation is insufficient to create a factual dispute to defeat summary judgment. R.W. Beck & Assocs. v. City & Borough of Sitka, 27 F.3d 1475, 1480 n.4 (9th Cir. 1994) ("Arguments based on conjecture or speculation are insufficient to raise a genuine issue of material fact . . . . If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." (internal quotation marks omitted) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)).

Plaintiff claims that Garcia admitted, in response to requests for admission, that she discussed one of Plaintiff's complaints against her with Coffin and thus that Coffin was aware of Plaintiff's complaints. (ECF No. 81-2 at 172.) Garcia stated as follows: "The responding party admits discussing with Goss that she had discussed one of Wheeler's complaints with Dr. Coffin." (Id) This statement, however, is vague as to time and does not describe the substance of Garcia's conversation with Coffin. It is insufficient to show that Coffin was made aware of, and willfully turned a blind eye to, ongoing retaliation at any time. For similar reasons, Plaintiff's claim that Coffin reviewed his mental health file on July 25, 2011, in relation to an administrative appeal, does not establish awareness of ongoing retaliation. (ECF No. 81-2 at 8.)

1    Summary judgment should be granted in favor of Defendant Coffin.

2              **4.      Defendants Trevino, Garcia, and Goss**

3                    **a.      Retaliatory animus**

4    Plaintiff's claims against these Defendants fail on several grounds. The primary

5    defect, however, is Plaintiff's inability to show that any of them took adverse action

6    against him <u>because of</u> his protected conduct. <u>Brodheim</u>, 584 F.3d at 1271. Plaintiff

7    alleges numerous protected activities that could be the source of some retaliatory

8    animus on the part of these Defendants. However, Plaintiff's regular participation in

9    protected conduct (filing a grievance against custody officers, complaining of misconduct

10   to various staff, writing a letter to the warden) does not automatically convert

11   Defendants' conduct into retaliatory conduct. <u>See</u> <u>Estrada v. Gomez</u>, No. C 96–1490 S1

12   (PR), 1998 WL 514068, at * 3 (N.D. Cal.1998). Accordingly, the Court will examine each

13   of Plaintiff's contentions in turn.

14   Plaintiff first argues that these Defendants retaliated against him because he filed

15   an administrative grievance regarding custody officers who allegedly used excessive

16   force against him on January 19, 2011. Following the January 19, 2011 incident, Plaintiff

17   was temporarily removed from Facility G-1. He returned to Facility G-1 on March 24,

18   2011. Although Plaintiff feels that Defendants' attitude toward him had changed by that

19   time, he alleges no adverse action on the part of any Defendant until June 2011. Indeed,

20   the records before the Court establish that Plaintiff's interactions with these Defendants

21   were uneventful in the interval between March 24, 2011 and early June 2011. To the

22   extent Plaintiff dislikes or disagrees with some of Trevino's clinical notes during this

23   interval, the Court finds Trevino's assessments to be of the same character as his

24   assessments prior to the January 19, 2011 incident. There is no evidence, circumstantial

25   or otherwise, to link Plaintiff's grievance regarding the January 19, 2011 incident to the

26   alleged adverse actions.

27   Plaintiff next argues that these Defendants retaliated against him for writing a

28   complaint letter to the Warden about perceived misconduct on Facility G-1. The letter

1  addressed only one of the Defendants – Defendant Garcia – by name, and detailed

2  perceived misconduct by other non-party staff and unnamed clinicians. Defendants

3  Trevino, Garcia, and Goss deny having any knowledge of this letter prior to the instant

4  litigation.  Plaintiff offers no admissible evidence to the contrary, and nothing suggests

5  that any of the named Defendants were aware of the letter at the time the adverse

6  actions occurred.[11] Thus, the letter cannot serve as a basis for Plaintiff's claim of

7  improper motive.

8       Plaintiff also appears to claim that Defendants retaliated against him for verbally

9  complaining to the Warden or her staff on June 22, 2011. Plaintiff's testimony concerning

10  this conversation does not constitute evidence of improper motive on the part of the

11  Defendants. Plaintiff testified during his deposition that he spoke with Chief Deputy

12  Warden Pennyworth on June 22, 2011. (Plaintiff's deposition at 121.) He told

13  Pennyworth that he felt "clinicians [were] spending too much time in the office . . . on the

14  internet" and that Plaintiff was not "getting enough groups." (Id.) Plaintiff testified that he

15  had no knowledge of any conversation between Warden Allison and the Defendants.

16  (Id.) This testimony reflects only that Plaintiff informed the Chief Deputy Warden of his

17  complaints; it does not impart knowledge of his complaints on any of the Defendants.

18  Plaintiff may not now create an issue of fact by contradicting his prior testimony.

19  VanArsdale v. Int'l Game Tech., 577 F.3d 989, 998 (9th Cir. 2009).

20       Plaintiff suggests two additional reasons Defendant Garcia may have retaliated

21  against him. First, Plaintiff contends that he heard the results of his second level appeal

22  against custody staff on May 25, 2011. He states that Garcia was present when he

23  heard and that her attitude changed toward Plaintiff thereafter. A mere change in

24  attitude, however, is not actionable. Plaintiff does not allege Garcia undertook any

25  adverse action against him until June 16, 2011, approximately three weeks later, when

26  Plaintiff concedes he made comments regarding Garcia's shoes to see her reaction.

27

28  [11] As stated above, Plaintiff's testimony that Rivero told Plaintiff that the Warden discussed the letter with Defendants on June 22, 2011 is inadmissible and cannot be considered in addressing this motion.

1    Additionally, Plaintiff provides no logical explanation for why Garcia's attitude would

2    change toward Plaintiff based on the result of his second level appeal, which apparently

3    was favorable to custody staff. This allegation is insufficient to support Plaintiff's claim.

4         Plaintiff also states that Garcia began to retaliate against him after he confronted

5    her in early June about what he perceived as her misconduct. However, it does not

6    appear that this action constituted protected conduct. According to Plaintiff, he did not

7    threaten to make a formal complaint against Garcia or to otherwise blow the whistle on

8    her alleged misconduct. Indeed, he denied in his deposition having any intention of

9    doing so. (Plaintiff's deposition at 56.) In fact, he reportedly counseled Garcia to take

10   steps to conceal her purported misconduct so that she would not be caught. In any

11   event, as has already been stated, Garcia did not take any allegedly adverse action

12   against Plaintiff until June 16, 2011, when she documented Plaintiff's comments

13   regarding her shoes. Accordingly, this allegation is insufficient to support Plaintiff's claim.

14        The absence of evidence that Defendants Trevino, Garcia, and Goss acted with a

15   retaliatory motive is a sufficient basis to recommend summary judgment be granted in

16   their favor. Nevertheless, the Court also will consider Defendants' additional arguments

17   regarding their conduct.

18                              **b.     Garcia**

19        Much of the conduct at issue relating to Garcia's reports is undisputed. Plaintiff

20   concedes that he frequently sat in the dayroom outside of Garcia's office and watched

21   her working. Plaintiff confronted Garcia in early June about her possible favoring other

22   inmates and her perceived change of  mood toward him. Plaintiff attempted to present a

23   paper he had written during a group session. Garcia would not allow it. Plaintiff then

24   attempted to present the paper to Garcia personally after the session.   Again she

25   refused him. Plaintiff made comments to Defendant Garcia on June 16, 2011 regarding

26   her shoes, just  to see her reaction. She relayed these incidents to Rivero and Isira.

27        Plaintiff disputes minute details regarding these events. He states that he was not

28   attempting to be overfamiliar or threatening and that his actions were mischaracterized.

                                          29

He denies ever being argumentative with Garcia. He states that Garcia made the June 16 incident appear more recent than it was when she spoke to Rivero on June 22. However, given Plaintiff's concessions that the incidents reported by Garcia actually occurred, he cannot plausibly claim that Garcia falsified reports of the events.

Thus, Plaintiff is attempting to assert liability against Garcia for making reports of incidents that actually occurred, solely because he believes the incidents should not have been cause for concern and/or should have been reported with a different gloss. Plaintiff bears the burden of proving "that there were no legitimate correctional purposes motivating the actions he complains of." Pratt, 65 F.3d at 808. In light of his concessions that these incidents occurred, he cannot meet this burden. See Johnson v. Cruthfield, No. 105-CV-0351 AWI DLBP, 2008 WL 2404265, at *2 (E.D. Cal. June 11, 2008), aff'd sub nom. Johnson v. Crutchfield, 362 F. App'x 590 (9th Cir. 2010).

Furthermore, to the extent Plaintiff wishes to argue that Garcia wrongly interpreted his conduct,[12] Garcia has presented a sworn declaration stating that she believed Plaintiff's conduct was improper and jeopardized her safety and that such belief motivated her actions. She continuously and consistently voiced her concerns to custody staff during her time at SATF and even after her departure. She shared her concerns in private emails with Defendant Goss. There is simply nothing in the record to suggest that Garcia's reports regarding Plaintiff reflected anything other than her legitimate, good faith concerns.

The Court notes additionally that Plaintiff himself professes to have had an unusually close relationship with Defendant Garcia prior to the incidents at issue here. He shared artwork and poetry with her. He claims to know the layout of her apartment in Corcoran and the color and style of her underwear. He claims to have possessed photographs of Garcia in various stages of undress that he passed on to another inmate

---

[12] The Court disagrees with Plaintiff's apparent argument that a mere difference of opinion regarding his intentions is sufficient to sustain his claim in this action. Such good faith differences, even if mistaken, would entitle Garcia to qualified immunity. See Kennedy v. City of Ridgefield, 439 F.3d 1055, 1061 (9th Cir. 2006). Nevertheless, this argument is addressed.

1  for safekeeping. He reacted negatively when others spoke ill of her or spoke favorably

2  regarding her appearance. He has conducted inquiries to learn her first and middle

3  names. He has attempted to obtain her home address in Los Angeles. Although Plaintiff

4  opines that such conduct is benign, when coupled with the activity reported by Garcia, it

5  nonetheless is indicative of behavior that could warrant legitimate safety and security

6  concerns.

7      Again, the Court emphasizes that the issue is not whether Garcia <u>correctly</u>

8  believed that Plaintiff was threatening or stalking her. Plaintiff cannot defeat summary

9  judgment by raising a factual dispute about whether he constituted an actual threat, and

10 it is not the Court's role to determine whether Plaintiff's conduct toward Garcia

11 constituted such a threat. <u>See</u> <u>Medina v. Dickinson</u>, No. 2:10-CV-0502 LKK AC, 2013

12 WL 268710, at *11 (E.D. Cal. Jan. 23, 2013). Instead, the Court must examine whether

13 Plaintiff has met his burden of raising a triable issue as to whether Garcia was motivated

14 by legitimate correctional goals, keeping in mind that the Court must accord wide-

15 ranging deference to prison administrators in their efforts to preserve internal order and

16 discipline and to maintain institutional security. <u>Bell</u>, 441 U.S. at 547. Again, the Court

17 concludes that Plaintiff cannot meet this burden.

18     Summary judgment should be granted in favor of Defendant Garcia.

19                          **c.      Goss**

20     Disputes of fact preclude a finding that Defendant Goss wrote her RVR to further

21 legitimate correctional goals. According to Goss, Plaintiff approached her in a way that

22 made her feel uncomfortable and threatened, as stated in her report. According to

23 Plaintiff, however, the RVR is entirely fabricated and the events described therein did not

24 occur. Of course, if the events did not occur, there would be no legitimate purpose in

25 writing them up or in bringing disciplinary charges.

26     Nevertheless, as stated above, Plaintiff has failed to show that Goss acted with a

27 retaliatory motive. At most, the evidence may be read to suggest that Goss was

28 motivated to remove Plaintiff from Facility G because she or Garcia did not like him or

1  did not want him around. However, the writing of a false report does not rise to the level

2  of a constitutional violation absent retaliatory motive. Plaintiff has no constitutionally

3  guaranteed immunity from being falsely or wrongly accused. See, e.g., Ellis v. Foulk, No.

4  14-cv-0802 AC P, 2014 WL 4676530, at *2 (E.D. Cal. Sept. 18, 2014) ("Plaintiff's

5  protection from the arbitrary action of prison officials lies in 'the procedural due process

6  requirements as set forth in Wolff v. McDonnell.'" (citing Hanrahan v. Lane, 747 F.2d

7  1137, 1140 (7th Cir. 1984))); Solomon v. Meyer, No. 11-cv-02827-JST (PR), 2014 WL

8  294576, at *2 (N.D. Cal. Jan. 27, 2014) ("[T]here is no constitutionally protected right to

9  be free from false disciplinary charges."); Johnson v. Felker, No. 1:12-cv-02719 GEB

10 KJN (PC), 2013 WL 6243280, at *6 (E.D. Cal. Dec. 3, 2013) ("Prisoners have no

11 constitutionally guaranteed right to be free from false accusations of misconduct, so the

12 mere falsification of a [rules violation] report does not give rise to a claim under section

13 1983.") (citing Sprouse v. Babcock, 870 F.2d 450, 452 (8th Cir. 1989) and Freeman v.

14 Rideout, 808 F.2d 949, 951-53 (2d. Cir. 1986)). His constitutional interests in this regard

15 are protected by the Due Process clause and the procedures afforded through the RVR

16 hearing.

17       Accordingly, summary judgment should be granted in favor of Defendant Goss.

18                              **d.    Trevino**

19        Plaintiff's allegations against Trevino are apparently two-fold: first, Trevino

20 allegedly made false remarks in Plaintiff's mental health notes; and second, Trevino

21 allegedly reported adverse information regarding Plaintiff to Isira during Plaintiff's

22 transfer to Facility E.

23       As with his allegations against Garcia, Plaintiff's complaints about Trevino's

24 notations in his mental health files are based on minute discrepancies regarding the

25 details of Plaintiff's mental health visits. On the whole, Plaintiff agrees with the thrust of

26 Trevino's notations: he and Trevino discussed issues Plaintiff was having with mental

27 health and custody staff. Trevino did not take Plaintiff's side and instead counseled him

28 regarding staff boundaries and overfamiliarity. Plaintiff agrees that he discussed with

Trevino differences between "convicts" on the mainline and "inmates" in the EOP program; however, he believes these comments were misconstrued. Plaintiff also agrees that he discussed with Trevino that he has a right to protect inmates and staff; he maintains in his opposition that he has such a right. Based on the foregoing, Plaintiff cannot show that Trevino lacked a legitimate purpose with regard to these notes.

In the same vein, Trevino's emails to Isira constitute information sharing between clinicians responsible for Plaintiff's care. Nothing before the Court indicates that Trevino knew or believed this information was false or that the communications were undertaken for anything other than legitimate purposes, i.e., maintaining institutional order and providing Plaintiff with appropriate mental health care. Indeed, records before the Court reflect that the clinicians involved in Plaintiff's care (both parties and non-parties alike) regularly communicated by email regarding Plaintiff's care. Often, such communications did not paint Plaintiff in a favorable light. This is true even of clinicians with whom Plaintiff had a positive therapeutic relationship. Trevino's emails to Isira, in themselves, are insufficient to support a claim of retaliation.

Summary judgment should be granted in favor of Trevino.

### 5. Isira

The record is bereft of any evidence that Isira acted with a retaliatory motive against Plaintiff in writing his clinical notes, changing Plaintiff's diagnosis, or terminating Plaintiff's EOP level of care. There is no evidence that Isira was aware of Plaintiff's complaints against custody staff, his administrative appeals against other individuals, or his informal complaints to the Warden at the time these actions occurred. Nor is there any evidence to suggest that this activity by Plaintiff motivated Isira's actions. There is some evidence in the record that Isira became aware of Plaintiff's administrative appeals long after Isira's direct involvement in Plaintiff's medical care ceased. However, such post hoc knowledge does not bear on the claims at issue.

It appears from the record that Isira may have formulated opinions about Plaintiff based in part upon information that was provided to him through Trevino and through the

1  chronos and clinical notes written by other Defendants. However, even assuming that

2  some or all of these chronos and notes were written with a retaliatory motive, there is no

3  evidence to suggest that Isira was aware of such retaliation or aware that the chronos

4  and notes may have been unreliable.

5     It is clear that Isira's interactions with Plaintiff were contentious and that Isira was

6  motivated to terminate Plaintiff's involvement in the EOP program. However, there is no

7  evidence in the record to suggest that such conduct was motivated by retaliation.

8  Summary judgment should be granted in favor of Isira on this claim.

9     The question of whether Isira's conduct was medically appropriate is discussed

10  below.

11  **B.     Eighth Amendment Medical Indifference**

12     The Eighth Amendment's prohibition against cruel and unusual punishment

13  protects prisoners not only from inhumane methods of punishment but also from

14  inhumane conditions of confinement. Morgan v. Morgensen, 465 F.3d 1041, 1045 (9th

15  Cir. 2006) (citing Farmer v. Brennan, 511 U.S. 825, 847 (1994) and Rhodes v.

16  Chapman, 452 U.S. 337, 347 (1981)). For claims arising out of medical care in prison,

17  Plaintiff "must show (1) a serious medical need by demonstrating that failure to treat [his]

18  condition could result in further significant injury or the unnecessary and wanton infliction

19  of pain," and (2) that "the defendant's response to the need was deliberately indifferent."

20  Wilhelm v. Rotman, 680 F.3d 1113, 1122 (9th Cir. 2012) (citing Jett v. Penner, 439 F.3d

21  1091, 1096 (9th Cir. 2006)).

22     "Indications that a plaintiff has a serious medical need include the existence of an

23  injury that a reasonable doctor or patient would find important and worthy of comment or

24  treatment; the presence of a medical condition that significantly affects an individual's

25  daily activities; or the existence of chronic or substantial pain." Colwell v. Bannister, 763

26  F.3d 1060, 1066 (9th Cir. 2014) (citation and internal quotation marks omitted); accord

27  Wilhelm v. Rotman, 680 F.3d 1113, 1122 (9th Cir. 2012); Lopez v. Smith, 203 F.3d 1122,

28  1131 (9th Cir. 2000).

1    Deliberate indifference, which is the subjective element of an Eighth Amendment

2  claim, is shown by "(a) a purposeful act or failure to respond to a prisoner's pain or

3  possible medical need, and (b) harm caused by the indifference." Wilhelm, 680 F.3d at

4  1122 (citing Jett, 439 F.3d at 1096). The requisite state of mind is one of subjective

5  recklessness, which entails more than ordinary lack of due care. Snow v. McDaniel, 681

6  F.3d 978, 985 (9th Cir. 2012), overruled in part on other grounds, Peralta v. Dillard, 744

7  F.3d 1076, 1082-83 (9th Cir. 2014); Wilhelm, 680 F.3d at 1122. "Medical malpractice

8  does not become a constitutional violation merely because the victim is a prisoner."

9  Estelle v. Gamble, 429 U.S. 97, 106 (1977); Snow, 681 F.3d at 987-88; Wilhelm, 680

10  F.3d at 1122.

11    Where a prisoner alleges deliberate indifference based on a delay in medical

12  treatment, the prisoner must show that the delay led to further injury. See Hallett v.

13  Morgan, 296 F.3d 732, 745-46 (9th Cir. 2002); McGuckin, 974 F.2d at 1060a; Shapley v.

14  Nevada Bd. Of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir. 1985) (per curiam).

15  Delay which does not cause harm is insufficient to state a claim of deliberate medical

16  indifference. Shapley, 766 F.2d at 407 (citing Estelle v. Gamble, 429 U.S. 97, 106

17  (1976)).

18    Finally, "[a] difference of opinion between a physician and the prisoner - or

19  between medical professionals - concerning what medical care is appropriate does not

20  amount to deliberate indifference." Snow, 681 F.3d at 987 (citing Sanchez v. Vild, 891

21  F.2d 240, 242 (9th Cir. 1989)); Wilhelm, 680 F.3d at 1122-23 (citing Jackson v.

22  McIntosh, 90 F.3d 330, 332 (9th Cir. 1986)).  Rather, Plaintiff "must show that the course

23  of treatment the doctors chose was medically unacceptable under the circumstances

24  and that the defendants chose this course in conscious disregard of an excessive risk to

25  [his] health." Snow, 681 F.3d at 988 (citing Jackson, 90 F.3d at 332) (internal quotation

26  marks omitted).

27    Viewing the evidence in the light most favorable to Plaintiff, there is sufficient

28  evidence upon which a jury could conclude that Isira was deliberately indifferent to

1   Plaintiff's serious mental health needs. According to Plaintiff, Isira was aggressive and

2   made racially charged remarks during their encounters. He terminated Plaintiff's EOP

3   level of care and changed Plaintiff's diagnosis. These changes were inconsistent with

4   the decisions of every other provider who saw Plaintiff in the time immediately preceding

5   and following Isira's involvement. A reasonable juror could conclude that these facts

6   reflect more than a mere difference of opinion between medical providers, but instead a

7   concerted effort to alter Plaintiff's mental health services in an effort to protect staff from

8   what was viewed as inappropriate behavior by Plaintiff.

9       Isira argues that his change in Plaintiff's diagnosis (to pedophilia and sexual

10  sadism) was supported by his review of records relating to Plaintiff's criminal offense.

11  According to Isira, records reflect that Plaintiff engaged in violent and sexually abusive

12  behavior toward his wife and children, including sodomizing his one year old son and

13  forcing his wife and children to engage in sexual acts with each other in Plaintiff's

14  presence. Although Plaintiff maintains his innocence on these claims, he nonetheless

15  was convicted. The Court cannot conclude that Isira's reference to these acts was

16  medically inappropriate. However, Plaintiff's convictions were remote in time, apparently

17  well over twenty years earlier. There is nothing before the Court to suggest that such

18  diagnoses were appropriate at the time Plaintiff was under Isira's care. Indeed,

19  subsequent providers concluded that, while Plaintiff's offenses may present "factors of

20  clinical relevance," they did not relate to Plaintiff's primary diagnoses or the focus of his

21  clinical needs.  (ECF No. 81-2 at 42.) Isira's decision to record pedophilia and sexual

22  sadism as Plaintiff's primary diagnoses, despite any evidence to indicate Plaintiff had

23  engaged in such behavior in the preceding twenty years, is sufficient to raise a triable

24  question regarding Isira's motives.

25      Additionally, it is plain from the evidence that Isira took direct action to terminate

26  Plaintiff's EOP level of care. Isira's motivation for this conduct is susceptible to more than

27  one interpretation. On the one hand, Isira may have been motivated by his belief that

28  Plaintiff's behavior reflected an inability to participate effectively in the EOP program.

36

1   Such a determination would not constitute deliberate indifference. On the other hand,

2   Isira may have been motivated to shield staff members from what he viewed as Plaintiff's

3   improper conduct, regardless of Plaintiff's need for EOP services, and with deliberate

4   indifference to such need. A jury could credit either interpretation.

5       Isira argues that he is entitled to qualified immunity on this claim because he

6   reasonably believed Plaintiff did not require EOP care and, to the extent he was

7   incorrect, such reasonable mistake would not subject him to liability. As stated above,

8   however, a reasonable juror could conclude that Isira was not motivated by a good faith,

9   but perhaps mistaken belief regarding the care Plaintiff required, and instead was

10  motivated by ill-will toward Plaintiff or other staffing considerations. These factual

11  disputes preclude a finding in favor of Isira on qualified immunity grounds.

12      Accordingly, disputes of fact preclude summary judgment on this claim. Summary

13  judgment should be denied.

14      **C.    Medical Malpractice**

15      Defendant Isira moves for summary judgment on Plaintiff's state law negligence

16  claim on the grounds that Plaintiff cannot produce evidence to show that Isira was

17  negligent and, in any event, Plaintiff failed to exhaust his claims as required under the

18  California Tort Claims Act. The Court finds it necessary to address only the latter

19  argument.

20      Under the California Tort Claims Act ("CTCA"), a plaintiff may not maintain an

21  action for damages against a public employee unless he has presented a written claim

22  to the state Victim Compensation and Government Claims Board ("VCGCB") within six

23  months of accrual of the action. Cal. Gov't Code §§ 905, 911.2(a), 945.4 & 950.2;

24  Mangold v. California Pub. Utils. Comm'n, 67 F.3d 1470, 1477 (9th Cir. 1995). Failure to

25  demonstrate such compliance constitutes a failure to state a cause of action and will

26  result in the dismissal of state law claims. State of California v. Superior Court (Bodde),

27  32 Cal.4th 1234, 1240 (2004).

28      Isira contends that Plaintiff's submissions to the VCGCB were untimely.

1    It is undisputed that Plaintiff submitted two claims to the VCGCB relating to

2 Defendant Isira's conduct. The first, No. G605113, is dated May 19, 2012 and claims

3 that Isira's alleged malpractice was discovered March 29, 2012. Therein, Plaintiff

4 complains of retaliation, harassment, changes to his treatment plan, and misdiagnosis.

5    The second, No. G605512, is dated June 29, 2012 and claims that Isira's alleged

6 malpractice was discovered the same day. Therein, Plaintiff claims that Isira is

7 unlicensed, improperly changed Plaintiff's level of care, committed malpractice,

8 misdiagnosed him, did not provide proper therapy, and retaliated against him.

9 Documents attached to the claim form indicate that Plaintiff's primary concern was Isira's

10 alleged lack of proper licensure.

11    Plaintiff plainly knew that Isira had removed him from the EOP Level of Care at

12 least as early as July 27, 2011. (ECF No. 74-2 at 151, 158-59.) He did not submit a claim

13 to the VCGCB until May 19, 2012, approximately ten months later. He did not exhaust

14 this claim within six months of accrual. Plaintiff's only excuse for this failure is that he

15 was gathering documents regarding Isira, presumably those relating to his licensure (or

16 lack thereof). He provides no authority to suggest that this action excuses his failure to

17 timely exhaust and the Court finds none. Malpractice claims based the reduction of

18 Plaintiff's level of care should be dismissed.

19    Plaintiff claims that he was not aware of Isira's misdiagnosis until March 29, 2012,

20 when he obtained documentation through an administrative appeal. (ECF No. 81 at 53-

21 54.) However, records submitted by Plaintiff reflect that Plaintiff complained to other

22 mental health providers regarding the change in his diagnosis as early as September 28,

23 2011. (ECF No. 81-2 at 22.) Plaintiff claims that he learned of the misdiagnosis on

24 September 28, 2011, but believed it to be a computer error and not attributable to Isira.

25    For the purposes of the CTCA, a cause of action accrues on the date that would

26 apply under the statute of limitations applicable to a dispute between private litigants.

27 Shirk v. Vista Unified School District, 42 Cal.4th 201, 208-09 (2007). The California

28 Supreme Court has held that the date of accrual of a cause of action is the time when

1    the cause of action is complete with all of its elements. <u>Norgart v. Upjohn Co.</u>, 21 Cal.4th

2    383, 389 (1999). Accrual may be delayed until the plaintiff discovers or has reason to

3    discover the cause of action. <u>Id.</u> The California Supreme Court has explained that "[a]

4    plaintiff has reason to discover a cause of action when he or she has reason at least to

5    suspect a factual basis for its elements." <u>Fox v. Ethicon Endo-Surgery, Inc.</u>, 35 Cal. 4th

6    797, 807 (2005) (internal quotation marks and citation omitted). This is not a

7    hypertechnical inquiry but instead looks to "whether the plaintiffs have reason to at least

8    suspect that a type of wrongdoing has injured them." <u>Id.</u> This rule applies "even if the

9    plaintiff does not have reason to suspect the defendant's identity." <u>Id.</u> It applies even

10    when the full extent of the plaintiff's injury is unknown. <u>Wallace v. Kato</u>, 549 U.S. 384,

11    391 (2007).

12          Based on the foregoing, the Court concludes that Plaintiff's claim for misdiagnosis

13    accrued on September 28, 2011, when Plaintiff discovered the alleged wrongdoing and

14    had reason to suspect that someone had injured him. Given the parties' contentious

15    relationship and the significant other changes to Plaintiff's treatment made by Isira,

16    Plaintiff at least had reason to suspect Isira's involvement. Regardless, however,

17    Plaintiff's professed ignorance regarding Isira's involvement does not delay accrual of

18    the cause of action under California law.  The cause of action accrued on September 28,

19    2011.

20          Again, Plaintiff's earliest submission to the VCGCB occurred on May 19, 2012,

21    nearly eight months later. Accordingly, he did not timely exhaust his claim and

22    malpractice claims based on Isira's misdiagnosis should be dismissed.

23          As these are the only two apparent bases for Plaintiff's malpractice claims against

24    Isira, Plaintiff's cause of action for medical malpractice should be dismissed in its

25    entirety.

26    **VI.**    **Conclusion and Recommendation**

27          Based on the foregoing, it is HEREBY RECOMMENDED that Defendants' motion

28    for summary judgment be GRANTED IN PART AND DENIED IN PART. Specifically,

summary judgment should be granted in favor of all Defendants on Plaintiff's First Amendment retaliation claim. Plaintiff's medical malpractice claims should be dismissed for failure to exhaust under the California Tort Claims Act. In all other respects the motion should be denied. The matter should proceed only against Defendant Isira on an Eighth Amendment claim for inadequate medical care.

The findings and recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(1). Within fourteen (14) days after being served with the findings and recommendations, the parties may file written objections with the Court. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." A party may respond to another party's objections by filing a response within fourteen (14) days after being served with a copy of that party's objections. The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal. Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   September 29, 2016        /s/ Michael J. Seng

UNITED STATES MAGISTRATE JUDGE